T.C. Memo. 2013-116

UNITED STATES TAX COURT

STEVEN E. VLACH AND NANCY VLACH, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   27199-07, 27816-07,       Filed April 30, 2013.
              27817-07.

<u>Michael B. Kratville</u>, for petitioners.

<u>Lisa Kathryn Hunter</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Steven E. Vlach, P.C., docket No. 27816-07; and Sev 711 Consulting, Inc., docket No. 27817-07.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined the following deficiencies in Federal income tax and section 6662(a)[2] accuracy-related penalties for (1) Steven E. Vlach and Nancy Vlach (Dr. and Mrs. Vlach, individually, and Vlachs, collectively) for tax years 2001, 2002, 2003, and 2004; (2) Steven E. Vlach, P.C. (Vlach P.C.), for tax years 2001 and 2002; and (3) Sev 711 Consulting, Inc. (Consulting Inc.), for tax years 2003 and 2004:

Steven E. Vlach and Nancy Vlach--Docket No. 27199-07

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2001 | $65,630 | $13,126.00 |
| 2002 | 68,301 | 13,660.20 |
| 2003 | 28,278 | 5,655.60 |
| 2004 | 12,038 | 2,407.60 |

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] Steven E. Vlach, P.C.--Docket No. 27816-07

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 2001 | $46,583 | $9,316.60 |
| 2002 | 45,375 | 9,075.00 |

Sev 711 Consulting, Inc.--Docket No. 27817-07

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 2003 | $9,912 | $1,982.40 |
| 2004 | 4,897 | 943.40 |

In the notices of deficiency respondent determined that certain trust arrangements petitioners used during the years at issue should be disregarded for tax purposes. As a result, respondent determined that petitioners were not entitled to deduct business expenses paid to the trusts and instead must include in their gross income receipts the trusts reported. Thus, the primary issue for decision is whether the trust arrangements petitioners created for the years at issue will be respected for tax purposes. The Court must also decide whether petitioners are liable for section 6662(a) accuracy-related penalties for the years at issue.

[*4]                          FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed, petitioners resided in, or had their principal place of business in, South Dakota.

Dr. Vlach is a medical doctor who has practiced medicine since 1989. During the years at issue Dr. Vlach was a physician at the Avera Sacred Heart Rural Health Clinic in Nebraska and, through February 2003, was an emergency room physician for Northwest Iowa Emergency Physicians (NWIEP). Mrs. Vlach is an emergency medicine nurse, and during the years at issue she worked for Mercy Medical Center in Iowa.

From 1996 through 2002 Dr. Vlach operated his medical practice through Vlach P.C., and after Vlach P.C. was dissolved in 2002, he continued his medical practice through Consulting Inc. Vlach P.C. and Consulting Inc. (collectively, corporations) were professional service corporations, and Dr. Vlach was their sole shareholder. With the exception of $5,597 in 2001, the corporations' sole sources of income for the years at issues were payments from NWIEP and Avera for Dr. Vlach's medical services. For 2001 and 2002 Vlach P.C. reported gross receipts of $353,549 and $358,774, respectively, and reported $114,000 and $104,500,

[*5] respectively, as Dr. Vlach's compensation.  For 2003 and 2004 Consulting Inc. reported gross receipts of $189,675, and $159,696, respectively, and reported $56,500 and $48,000, respectively, as Dr. Vlach's compensation.  After deducting Dr. Vlach's salary, the corporations deducted the remainder of their income as business expenses for, inter alia, rent, legal and professional fees, repairs and maintenance, and other expenses.[3]  The corporations paid zero tax.

In addition to providing traditional medicine services, Dr. Vlach practiced alternative medicine with an emphasis on chelation therapy.[4]  He provided alternative medicine services at the Avera clinic, where another doctor and a nurse practitioner, both Avera employees, assisted him.  Because Dr. Vlach's medical malpractice insurance did not insure him for his chelation therapy practice, he sought professional protection by becoming a member of Alternative Therapies Health Association (ATHA).  In order to receive Dr. Vlach's alternative therapy

---

[3]The corporations' reported business expenses were primarily payments made to the trusts, discussed below.

[4]Chelation therapy involves the administration of a vitamin and mineral mixture, which includes vitamin C, selenium, and a chelating agent called "EDTA", through an IV in the arm over a two-hour period twice a week.  When the mixture is in the bloodstream, it chelates and removes heavy metals from the blood.  After administering the intravenous chelation therapy, Dr. Vlach monitored his patients for two to three months to ensure that their kidney functions remained stable.

[*6] services, his patients had to be ATHA members who, as a condition of membership, signed a waiver and arbitration agreement.

After providing chelation therapy services in 2001 and 2002, Dr. Vlach discontinued his services in early 2003 when he changed insurance carriers.[5] Whereas Dr. Vlach's insurance provider for 2001 and 2002 had insured him for traditional medical practices and had excluded his chelation therapy services, his new insurance carrier refused to insure him for any medical practice if he continued providing chelation therapy. As a result, Dr. Vlach discontinued his chelation therapy services in early 2003 and, as of the date of trial, did not practice chelation therapy.

The Trusts

In 1995 Dr. Vlach attended an ATHA seminar to learn more about chelation therapy and other alternative medicine practices. Since chelation therapy and many other alternative medicine practices were excluded from traditional medical malpractice insurance, Dr. Vlach like many other ATHA members was concerned with asset protection. ATHA invited an affiliate of the American Society of Trust

---

[5]At trial Dr. Vlach explained that he was required to change insurance carriers because of a lawsuit that he had settled.

[*7] Planners to present at the seminar. That year Karl Dahlstrom, who was affiliated with the American Society of Trust Planners, presented.

Before 1995 Dahlstrom was involved in several lawsuits memorializing his abusive trust promotions and practices,[6] but Dr. Vlach had never heard of Dahlstrom before the ATHA seminar. Convinced that Dahlstrom offered valuable tax planning and asset protection advice, Dr. Vlach purchased trust documents from Dahlstrom to create the following trusts: San Dee Cristo Trust (San Dee Cristo), Mt. Sophris Trust (Mt. Sophris), and the Charitable Remainder Trust of Ixlandia (Ixlandia).

On December 28, 1995, the Vlachs formed San Dee Cristo and Mt. Sophris using identical trust documents Dahlstrom provided. The trust documents stated that Charles J. Vlach, M.D., Dr. Vlach's father, was the "Creator" and the Vlachs were the "Exchangors." As "exchangors", the Vlachs each received 50 trust certificate units and $10 in exchange for real and personal property. The trust certificates stated that ownership of the certificates did not entitle the holders to any legal or equitable title in trust property or management.

---

[6]For information regarding Dahlstrom's abusive trust practices see Akland v. Commissioner, 767 F.2d 618 (9th Cir. 1985), aff'g T.C. Memo. 1983-249, United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983), and Dahlstrom v. Commissioner, T.C. Memo. 1991-264 and T.C. Memo. 1991-265, aff'd without published opinion, 999 F.2d 1579 (5th Cir. 1993).

**[\*8]**  Dr. and Mrs. Vlach were appointed the first and second trustees, respectively, of San Dee Cristo and Mt. Sophris.[7]  As trustees they had exclusive power to construe the meaning and intent of the trust documents, to distribute proceeds and income at their discretion, and to shorten the life of the trusts.  Moreover, all property contributed to the trusts was conveyed to the trustees to act as "absolute owners and hold title in fee simple."

Dr. Vlach generally separated his business and personal activities between the trusts by allocating income and expenses from his alternative medical practices, including his chelation therapy services, primarily to San Dee Cristo and his real estate assets and expenses to Mt. Sophris.  The Vlachs contributed $1,500 cash, an ATHA membership, and an inventory of medical and health supplements to San Dee Cristo.  To Mt. Sophris they contributed their home at 3413 Lindewood Street and the contents therein.[8]  In 1996 the Vlachs sold the 3413

---

[7]The Vlachs prepared minutes of a trustees meeting purportedly held on January 24, 1996, for San Dee Cristo, Mt. Sophris, and Ixlandia, the last of which had not yet been created.  In the minutes the Vlachs named three third parties as trustees of each of the trusts, but these individuals were never notified of their appointments.  Petitioners concede that the January 24, 1996, meeting never took place.  They also concede that the Vlachs never revoked nor facilitated any of the actions reflected in the minutes and, therefore, the Vlachs were the only trustees of the trusts.

[8]The Vlachs, however, never legally transferred the title of the 3413

(continued...)

[*9] Lindewood Street property and purchased a home at 822 East St. Andrews Circle for $350,000, with a monthly mortgage payment of $2,532.52. On August 26, 1998, the Vlachs transferred their home to Mt. Sophris by executing a warranty deed.[9]

After creating the trusts, Dr. Vlach continued to operate his medical practice and use his personal assets, including his home and its contents, in the same manner as before the trusts were created. Dr. Vlach operated San Dee Cristo as a business selling vitamins and providing chelation therapy services. On a Form 1041, U.S. Income Tax Return for Estates and Trusts, San Dee Cristo reported all income and expenses from Dr. Vlach's sale of vitamins and chelation therapy services. However, Dr. Vlach purchased the vitamins and supplies related to the chelation therapy services with a personal credit card. Moreover, Dr. Vlach performed all chelation therapy services on behalf of San Dee Cristo but never had an employment agreement or received a salary. Dr. Vlach met with his vitamin

---

[8](...continued)
Lindewood Street property to Mt. Sophris. In an attachment to the Mt. Sophris trust document the "contents" are described as, inter alia, computers, stereo equipment, electronics, bedroom sets, furniture, decorations, a handgun and ammo, and clothing and shoes.

[9]The warranty deed contains a typo and lists the property's address as "922 East St. Andrews Circle".

[*10] and chelation therapy patients at the Avera clinic, where he also practiced traditional medicine.

The Vlachs used Mt. Sophris to hold title to their home and personal assets.[10] On a Form 1041 Mt. Sophris reported rent income received from the Vlachs for the personal use of their home and from the corporations for use of a home office and equipment. The Vlachs and the corporations, Vlach P.C. for 2001 and 2002, and Consulting Inc. for 2003 and 2004, each paid Mt. Sophris $3,500 in rent, a total of $7,000, per month. However, despite Mt. Sophris' alleged ownership of the home, Dr. Vlach took out a home equity line of credit on the property and used the credit to pay personal expenses such as credit card payments and finishing the Vlachs' basement. Moreover, on their personal Federal income tax returns for the years at issue the Vlachs claimed itemized deductions for real estate taxes and interest on the home mortgage and the home equity loan.

The primary sources of the trusts' income were payments from the corporations. According to the parties' stipulations, in 2001 Vlach P.C. deducted payments to San Dee Cristo and Mt. Sophris totaling $164,000, which included

---

[10]At trial Dr. Vlach explained that he transferred his home and personal assets to Mt. Sophris to protect them from potential medical malpractice lawsuits.

[*11] $84,000 in rent,[11] $35,000 of contract services, $39,000 of equipment rental, and $6,000 for a chelation services assessment. In 2002 Vlach P.C. deducted payments to San Dee Cristo and Mt. Sophris totaling $160,000, which included $58,500 in rent and $101,500 in contract services. In 2003 Consulting Inc. deducted payments to San Dee Cristo and Mt. Sophris totaling $61,100,[12] which included $40,100 in rent, $20,000 for contract services, and $1,000 for retirement expenses and management fees. In 2004 Consulting Inc. deducted payments to San Dee Cristo and Mt. Sophris totaling $32,868, which included $27,168 in rent, $1,500 of legal expenses, $3,000 for repairs and maintenance, and $1,200 for business promotion.

In addition to receiving payments from the corporations, Mt. Sophris received rental income from the Vlachs for the personal use of their home, and San Dee Cristo received income from Dr. Vlach's sale of vitamins and chelation therapy services.

---

[11]On Form 1120, U.S. Corporation Income Tax Return, for tax year 2001 Vlach P.C. deducted $84,000 in rent, $42,000 to San Dee Cristo, only $38,500 of which was actually paid, and $42,000 to Mt. Sophris.

[12]In the notice of deficiency for Consulting Inc. respondent included only $59,100 as a constructive dividend to the Vlachs.

[*12] The Vlachs used Mt. Sophris trust funds to pay a variety of expenses that were primarily personal. For example, Dr. Vlach used Mt. Sophris funds to, inter alia: (a) pay residential expenses, such as the mortgage, utilities, house cleaning, snow removal, patio furniture, home insurance, and lawn care; (b) pay personal expenses, such as dog food, veterinary bills, cable service, exercise equipment, country club fees, and life insurance on Dr. Vlach; and (c) remodel the Vlachs' basement to include an entertainment center and chelation therapy service bar and station that was never put into service.

The Vlachs also used San Dee Cristo trust funds for personal expenses and investments, including: (a) gambling at certain sports betting venues such as BML Sportsbook and Powersyn International Racing Group; (b) purchasing and maintaining a timeshare in Mexico; and (c) investing in rare coins, metals, and stocks. Unlike Mt. Sophris, however, the Vlachs used San Dee Cristo trust funds to promote Dr. Vlach's alternative medicine interests. For example, Dr. Vlach operated his alternative medicine practice through San Dee Cristo, and used San Dee Cristo trust funds to invest in other alternative medicine practices, such as a medical syringe company and an offshore medical clinic.[13] Although Dr. Vlach

---

[13]At trial Dr. Vlach explained that the accounts of the offshore clinic were

(continued...)

[*13] conceded that some of the reported expenses were personal and not proper trust expenses, he maintained that he properly used San Dee Cristo trust funds for gambling and other investments to make San Dee Cristo "self-funding". His intention was to create a self-funded trust that would allow him to retire from traditional medicine and practice alternative medicine full time.

After deducting a variety of expenses, as described above, San Dee Cristo and Mt. Sophris deducted their net income as income distributions to Ixlandia for each year at issue.[14] Consequently, San Dee Cristo and Mt. Sophris reported zero tax for the years at issue.

On December 17, 1996, the Vlachs formed Ixlandia, which was intended to be a charitable remainder trust. According to the Ixlandia trust document the Vlachs were the grantors and trustees, and the named beneficiaries were Cedar Catholic High School, the National Arbor Day Foundation, and the Nature Conservancy. The Vlachs, as grantors, purportedly transferred $100 cash, 100 units of Mt. Sophris, and 100 units of San Dee Cristo to Ixlandia. The trust document prohibited additional contributions. The trust document also provided

---

[13](...continued)
seized after the events of September 11, 2001, and as a result, the whole venture failed in 2002.

[14]In 2003, however, San Dee Cristo did not report any taxable income and therefore did not report any distribution to Ixlandia.

[*14] for an annual life annuity for the Vlachs, in their individual capacities, equal to 5% of the net fair market value of the trust assets as of the date of the initial transfer.[15] Ixlandia, however, paid the Vlachs an annual annuity of $1,762.[16] Other than a $100 donation to Cedar Catholic High School in 2004, Ixlandia did not make any distributions to the charitable beneficiaries.

During 2002, 2003, and 2004[17] Ixlandia reported income from San Dee Cristo and Mt. Sophris equal to the combined income distributions reported by San Dee Cristo and Mt. Sophris on the respective Schedule B, Income Distribution Deduction, of their Forms 1041. For example, in 2002 San Dee Cristo and Mt. Sophris reported income distribution deductions of $27,820 and $111,394, respectively, to Ixlandia, and Ixlandia reported income distributions of $139,190.[18]

---

[15]On its trust return for tax year 2002 Ixlandia reported that the fair market value of its assets was $352,357, 5% of which is $17,617.85.

[16]On their personal tax returns for the years at issue, the Vlachs reported receiving an annual annuity of $1,762. Ixlandia, however, reported annuity payments for tax years 2002 and 2004 only.

[17]Ixlandia's Form 1041-A, U.S. Information Return Trust Accumulation of Charitable Amounts, for 2001 was not included in the record. Nonetheless, San Dee Cristo and Mt. Sophris reported income distribution deductions to Ixlandia of $9,335 and $84,806, respectively, in 2001.

[18]The combined income distribution deductions reported by San Dee Cristo and Mt. Sophris total $139,214, and not $139,190, which was reported by Ixlandia.

[*15] Ixlandia's bank account, however, reported a total deposit of $2,801.78 in 2002, and of this amount $1,740 was contributed by San Dee Cristo and $1,061.78 was contributed by Mt. Sophris. Except for bank statements and canceled checks, Ixlandia did not maintain any books and records for the years at issue.

The Vlachs, the corporations, and the trusts timely filed Federal income tax returns for the years at issue. The Vlachs hired Nina Williams, who was referred to them by Dahlstrom, to prepare their personal income tax returns, the corporate returns, and the trust returns.[19] Although the Vlachs hired Williams in 1996, they did not meet with her until 2000. Williams prepared general ledgers and income tax returns for petitioners using information Dr. Vlach provided. Using check registers, Dr. Vlach classified expenses for Williams and advised her as to which entity the expenses related to. Williams relied on Dr. Vlach's classifications to prepare petitioners' income tax returns. At trial Dr. Vlach and Williams admitted that certain deductions were misclassified or otherwise improper.

On August 27, 2007, respondent issued notices of deficiency to the Vlachs for tax years 2001 through 2004, to Vlach P.C. for tax years 2001 and 2002, and to

---

[19]Williams is not an enrolled agent and is not a certified public accountant.

**[\*16]** Consulting Inc. for tax years 2003 and 2004. Petitioners timely filed petitions with the Court seeking redetermination.

## OPINION

### I. Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Taxpayers also bear the burden of proving that they are entitled to any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must maintain sufficient records to establish the amounts of allowable deductions and to enable the Commissioner to determine the taxpayers' correct tax liabilities. See sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999); sec. 1.6001-1(a), Income Tax Regs.

Under section 7491(a), the burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any relevant factual issue and meets other requirements. Petitioners have not argued or established that section 7491(a) applies, and therefore the burden of proof remains on petitioners.

[*17] II. Economic Substance of the Trusts

Respondent determined that San Dee Cristo, Mt. Sophris, and Ixlandia were sham entities with no economic substance and, as a result, the Vlachs were required to include in their gross income receipts reported by the trusts.[20] Respondent also determined that to the extent the income reported by the trusts was business income, the Vlachs were entitled to a corresponding business expense deduction. Respondent disallowed the corporations' business expense deductions for payments to the trusts because the trusts were shams and the deductions were not for ordinary, necessary, and reasonable business expenses. Thus, the primary issue in this case is whether the trusts the Vlachs created will be respected for Federal tax purposes.

Petitioners assert that San Dee Cristo and Mt. Sophris were legitimate trusts organized under State law to advance Dr. Vlach's alternative medicine practice and protect his personal assets from potential lawsuits related to his medical services. Petitioners further claim that because San Dee Cristo and Mt. Sophris had legitimate business purposes, the corporations properly deducted all payments

---

[20]Respondent did not determine any income tax deficiencies from the trusts because respondent determined that they were sham entities. Therefore, respondent properly did not issue notices of deficiency to the trusts.

[*18] made to these trusts as business expenses.  Petitioners also maintain that

Ixlandia was a proper charitable remainder trust.

While a taxpayer has the legal right to minimize his taxes or avoid them by

legal means, Gregory v. Helvering, 293 U.S. 465, 469 (1935), the Court has held

that "[w]hen the form of the transaction has not, in fact, altered any cognizable

economic relationships, we will look through that form and apply the tax law

according to the substance of the transaction", Zmuda v. Commissioner, 79 T.C.

714, 719-720 (1982), aff'd, 731 F.2d 1417 (9th Cir. 1984).  This rule applies

regardless of whether the form of the transaction is an entity, such as a trust, with a

separate existence recognized under State law.  Id.

In determining whether a trust should be respected for Federal tax purposes,

the Court generally considers whether the trust had a valid purpose other than tax

avoidance and whether the taxpayer meets certain requirements.  Markosian v.

Commissioner, 73 T.C. 1235, 1243-1244 (1980).

Petitioners contend that the trusts were not created for tax-avoidance

purposes but primarily for asset protection.[21]  Specifically, Dr. Vlach wanted to

---

[21]At trial Dr. Vlach explained that he created San Dee Cristo to be a self-funded trust that would replace his emergency room income and allow him to pursue alternative medicine full time.  To accomplish this goal, petitioners made payments
(continued...)

[*19] protect his personal and business assets from potential lawsuits related to his chelation therapy and alternative medicine services, which were not covered by insurance.

To pursue this goal, the Vlachs allegedly transferred Dr. Vlach's medical assets to San Dee Cristo and their real estate to Mt. Sophris. Petitioners, however, never established that San Dee Cristo and Mt. Sophris owned the medical equipment and real estate purportedly rented during the years at issue. Petitioners also never explained how the trusts provided more protection against potential lawsuits than the corporate form in which Dr. Vlach operated his traditional medical practice. Indeed, as discussed in more detail below, any asset protection provided by the trusts was in form only.

Petitioners' claims that the trusts were not created for tax-avoidance purposes are also undermined by the fact that Dr. Vlach purchased the trust documents from Dahlstrom, an abusive trust promoter, and executed the form documents without variation and according to Dahlstrom's instructions. Petitioners did not seek independent legal or tax advice when creating the trusts

---

[21](...continued)
to San Dee Cristo that were labeled "pre-paid rent" and "business development". However, petitioners did not cite an authority to support their claim that this was a legitimate business purpose; and they failed to provide any details or documentary evidence regarding these expenses.

[*20] and in fact employed a tax return preparer referred by Dahlstrom to report their income and expenses. While Dr. Vlach may have been unaware of Dahlstrom's history or of his need to seek independent counsel, the Court suspects that Dahlstrom probably promoted tax avoidance during the seminar and subsequent meetings as an objective of his trusts.[22] Evidence of such tax-avoidance objectives is reflected in the operation of the trusts.

For example, during the years at issue, the trusts' income came primarily from three sources, namely, rent payments from the Vlachs, payments from the corporations, and income from vitamin and chelation therapy sales, the latter two of which were never taxed.[23] With respect to the corporations' payments, the corporations transferred a portion of Dr. Vlach's taxable earnings from his

---

[22]Although petitioners claim that they were not aware of Dahlstrom's history, see supra p. 7, during the course of litigation they advanced many frivolous issues that were consistent with Dahlstrom's tax-avoidance objectives. Upon entry of appearance by their counsel and upon counsel's advice, petitioners abandoned their frivolous claims. On the basis of their counsel's advice and before trial, petitioners filed an amendment to the second amended petition ratifying the second amended petition. Petitioners' second amended petition deleted various frivolous arguments raised in their initial pro se pleadings.

[23]With the exception of the Vlachs' income used to make rent payments, which presumably was taxed once on the Vlachs' personal tax returns, the income used to pay the corporations' business expenses to San Dee Cristo and Mt. Sophris and the income San Dee Cristo received from vitamin and chelation therapy sales was never taxed.

[*21] traditional medical practice, which ranged from approximately 45% of his earnings in 2001 and 2002 to 20% in 2003 and 2004, to San Dee Cristo and Mt. Sophris, and then deducted the payments as business expenses.[24] The corporations paid zero tax. San Dee Cristo and Mt. Sophris then reported a transfer of their net income, which included the corporations' payments, the Vlachs' rent payments, and the income from vitamin and chelation therapy sales, to Ixlandia. San Dee Cristo and Mt. Sophris deducted the payments to Ixlandia as nontaxable income distributions and, like the corporations, reported zero tax.[25] The income distributions to Ixlandia, however, were made only to the extent necessary to pay the Vlachs a life annuity.[26] Dr. Vlach's taxable earnings from his traditional

---

[24]During 2001, 2002, 2003, and 2004 NWIEP and Avera paid the corporations $353,549, $358,774, $189,675, and $159,696, respectively, for Dr. Vlach's medical services. After the corporations deducted approximately one-third of Dr. Vlach's earnings as compensation, they deducted $164,000, $160,000, $61,100, and $32,868, respectively, as payments to San Dee Cristo and Mt. Sophris.

[25]Ixlandia reported combined income distributions from San Dee Cristo and Mt. Sophris of $139,190, $39,981, and $50,359, for 2002, 2003 and 2004, respectively. Ixlandia's return for tax year 2001 was not submitted into the record; however, Mt. Sophris and San Dee Cristo deducted $84,806 and $9,335, respectively, as income distributions to Ixlandia in 2001.

[26]For example, in 2002 Ixlandia's bank account reported a total deposit of $2,801.78, of which San Dee Cristo contributed $1,740 and Mt. Sophris contributed $1,061.78.

[*22] medical practice and his sale of vitamin and chelation therapy services therefore became effectively nontaxable as a result of petitioners' erroneous reporting of the trust transfers.

Accordingly, San Dee Cristo, Mt. Sophris, and Ixlandia were a series of trusts formed according to Dahlstrom's instructions to disguise or eliminate taxable earnings from Dr. Vlach's business activities and, as such, were created primarily for tax-avoidance purposes.[27]

Tax motivation alone, however, is not sufficient grounds for disregarding the trusts, and the Court must consider the following four factors: (1) the grantor-

---

[27]The Court believes that the documents used to create the trust arrangement at issue were tax motivated, regardless of whether Dr. Vlach was aware of such tax-avoidance motivations at the time the trusts were created. Nonetheless the Court is sympathetic to Dr. Vlach's intended business purpose for San Dee Cristo.

Dr. Vlach, who had family members die of cancer, was passionate about pursuing and advancing alternative therapies, and in particular chelation therapy, to treat diseases such as cancer in the United States. Despite his medical malpractice insurance company's failure to cover chelation therapy, Dr. Vlach was convinced that chelation therapy offered benefits that were not otherwise available and, consequently, was determined to make these therapies available to his patients while potentially risking his professional and personal assets.

Interestingly, according to a recent medical study, Dr. Vlach may have been right about the possible benefits of chelation therapy. See Roni Caryn Rabin, "New Look at Therapy After Trial", N.Y. Times, Apr. 16, 2013, at D5. However, for the reasons discussed below, Dr. Vlach's idealistic, and even perhaps quixotic, intentions alone do not support respecting the form of San Dee Cristo for Federal tax purposes.

**[*23]** taxpayer's relationship to the trust property materially changed after the trust was created; (2) the trust had an independent trustee; (3) an economic interest in the trust passed to other beneficiaries; and (4) the taxpayer felt bound by restrictions imposed by the trust or the law of trusts. See Markosian v. Commissioner, 73 T.C. at 1243-1244; see also AMC Trust v. Commissioner, T.C. Memo. 2005-180. Petitioners have conceded that the trusts did not have independent trustees during the years at issue. The Court will therefore consider the remaining factors.

Under the first factor the Court considers whether the grantor's relationship to the trust property materially changed after the creation of the trust. Markosian v. Commissioner, 73 T.C. at 1243-1244. As a threshold matter, however, the Court looks to the economic realities of the trust arrangement to ascertain the true grantor, settlor, or creator, notwithstanding a designation in the trust document to the contrary. Zmuda v. Commissioner, 79 T.C. at 720-721; see also Richardson v. Commissioner, T.C. Memo. 2006-69, aff'd, 509 F.3d 736 (6th Cir. 2007).

The Ixlandia trust document named the Vlachs as the grantors, but the San Dee Cristo and Mt. Sophris trust documents named Dr. Vlach's father as the

[*24] creator.[28]  The Vlachs were named the "exchangors" and trustees.  Except for signing the San Dee Cristo and Mt. Sophris trust documents, Dr. Vlach's father did not participate in the creation of the trusts or contribute assets, and after he appointed Dr. Vlach as the first trustee, he relinquished any further obligation to the trusts.  The Vlachs, on the other hand, contributed all trust assets and, as trustees, had exclusive control over the meaning and intent of the trust documents and of their assets.  The Vlachs were therefore the true creators of San Dee Cristo and Mt. Sophris.

After the creation of the trusts, the Vlachs, as grantors, conducted their business and personal lives in the same manner as before the trusts were created. Dr. Vlach continued his medical practice as a physician at the Avera clinic and, until 2003, as an emergency room physician for NWIEP.  He also continued his chelation therapy and alternative medicine practices at the Avera clinic until he was forced to discontinue his services for insurance purposes.  Dr. Vlach used the same office equipment that he had used before, and, except for their 1996 move, the Vlachs lived in the same house with the same furnishings, clothing, and maintenance as before the trusts were created.  Thus, the Vlachs'

---

[28]Dr. Vlach's father, who was also a doctor, was diagnosed with cancer in 2001 and died in August 2002.  His father's illness and subsequent death was Dr. Vlach's primary motivation for pursuing alternative medicine full time.

**[*25]** relationship to the trust property did not materially change after the trusts were created.

Second, except for Ixlandia's $100 donation to Cedar Catholic High School in 2004, the Court cannot identify any economic interest that passed to beneficiaries other than the Vlachs under the trust arrangement. As discussed above, the corporations transferred taxable earnings to San Dee Cristo and Mt. Sophris, and after San Dee Cristo and Mt. Sophris used those earnings for a variety of personal investments and expenses, they deducted their net income as nontaxable income distributions to Ixlandia. The only income ever transferred to Ixlandia, however, was the amount necessary to pay the Vlachs a life annuity. Thus, petitioners failed to prove that any economic interest passed to anyone other than the Vlachs.

Likewise, the investments made and expenses paid by San Dee Cristo and Mt. Sophris were transfers, albeit indirectly, of economic interests to the Vlachs. The Vlachs, as trustees, had exclusive power to distribute trust proceeds and income at their discretion and to act as absolute owners of all property contributed to the trusts. The Vlachs used trust funds to pay for personal investments, such as sports gambling, a timeshare, investments in rare coins, and expenses for mortgage

[*26] and utility payments, furniture, dog food, exercise equipment, and country club dues, thereby conferring an economic interest in the trusts on themselves.[29]

Finally, the documents did not impose any meaningful restrictions on the Vlachs. The only affirmative restriction the trust documents placed on the Vlachs was to continue business and conserve trust property. The Vlachs, however, used trust funds for personal investments and expenses.

After considering the factors described above, the Court concludes that San Dee Cristo, Mt. Sophris, and Ixlandia were shams, lacking economic substance, and are to be disregarded for Federal income tax purposes. The income and allowable expenses attributed to the trusts are allocated among petitioners as follows.

III. Business Expense Deductions

Respondent determined that the corporations' business expense deductions for payments made to San Dee Cristo and Mt. Sophris should be disallowed for the years at issue because the trusts were shams that lacked economic substance. Respondent also contends that the deductions were not ordinary, necessary, and reasonable business expenses and in some cases lacked substantiation.

---

[29]Although the Court recognizes that some of these payments may be allowable as business expense deductions under sec. 162, petitioners improperly reported the expenses on the trust returns.

[*27] Respondent allowed, however, all vitamin and chelation business-related expense deductions San Dee Cristo claimed but attributed such deductions to Dr. Vlach individually.

Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." New Colonial Ice Co. v. Helvering, 292 U.S. at 440; see also Rule 142(a). Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred by a taxpayer in carrying on a trade or business. An expense is ordinary if it is normal or customary within a particular trade, business, or industry. Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful for the development of the business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943). In contrast, section 262 precludes deductions of "personal, living, or family expenses."

For the years at issue, respondent disallowed the following payments by the corporations to San Dee Cristo and Mt. Sophris: $209,768 for rent, $39,000 for equipment rental, $156,500 for legal and professional fees, $1,000 for pension and profit sharing plans, $3,000 for repairs and maintenance, and $7,200 for other expenses. With respect to the rent payments, the corporations and the trusts did not have a written rental or lease agreement. The corporations paid Mt. Sophris

[*28] $3,500 per month for a 300-square-foot home office and, according to petitioners, the 850-square-foot basement that was remodeled to provide chelation therapy services.[30] The Vlachs' home, however, was not zoned for business use, and during the years at issue the Vlach family personally used their basement. At trial Dr. Vlach testified that he did not see any patients at his home and he never performed chelation therapies in his basement. In fact, during 2001 and 2002, when Dr. Vlach provided chelation therapy services,[31] he performed his services at the Avera clinic, where he had the necessary equipment and an office. Moreover, it is not clear why the corporations, through which Dr. Vlach operated his traditional medical practice, would rent office space for Dr. Vlach's alternative medicine practice that was allegedly operated through San Dee Cristo. For all the foregoing reasons, the Court finds that the corporations' rent payments to the trusts were not ordinary and necessary expenses within the meaning of section

---

[30]The parties dispute whether the corporations rented the Vlachs' 850-square-foot basement.

[31]Dr. Vlach discontinued his chelation therapy services in 2003 when he changed insurance carriers. See supra p. 6.

[*29] 162(a) and, accordingly, respondent's determination to disallow the rent payments is sustained.[32]

Similarly, the corporations' equipment rent payments were not ordinary and necessary expenses under section 162(a). First, it is not clear whether San Dee Cristo and Mt. Sophris owned the equipment that was purportedly rented by the corporations. At trial Dr. Vlach could not identify the rented equipment in San Dee Cristo's books, and San Dee Cristo and Mt. Sophris did not depreciate or report any equipment on their returns.[33] Nonetheless, Dr. Vlach testified that the equipment rented was worth at most $15,000 or $16,000, which is less than half of the corporations' $39,000 rent payment. In addition, petitioners did not substantiate use of the rented equipment. In fact, it is not clear when or where Dr. Vlach and his corporations used the equipment, because during 2001 and 2002 he performed chelation therapy services at the Avera clinic and during 2003 and 2004

---

[32]Although petitioners argue that the rent payments were misreported in part and were actually for other expenses, such as business development and promotion, they failed to substantiate or to otherwise present evidence supporting their position.

[33]All identifiable depreciable assets related to Dr. Vlach's medical practice were reported on the corporations' returns. The Court notes that the Vlachs' may be able to report expenses for the chelation therapy medical equipment, including two lasers, a therapy unit, a modulating machine, and beads, on their individual returns, provided that the requirements of sec. 162 are met.

[*30] he discontinued all chelation therapy services. Respondent's determination to disallow the corporations' payments for equipment rental is therefore sustained.

The corporations also deducted $156,500 for legal and professional fees paid to the trusts. However, petitioners failed to establish that the trusts performed any services for the corporations. Dr. Vlach could not identify what services the trusts performed and testified that San Dee Cristo did not perform any services during 2001.[34] Instead, petitioners and Williams claim that they misclassified certain expenses and that payments for professional fees, inter alia, were actually for business development and promotion.[35] Petitioners, however, did not substantiate any expenses for business development and promotion or provide a business reason therefor. Accordingly, respondent's determination to disallow the corporations' expenses for legal and professional fees is sustained.

The corporations' deductions for all other expenses, including payments for pension and profit sharing plans, repairs and maintenance, and other expenses,

---

[34]Vlach P.C. deducted $35,000 in legal and professional fees allegedly paid to the trusts in 2001.

[35]Petitioners also claim that the corporations' expenses included prepaid rent. However, as discussed above, petitioners failed to substantiate any rent expense and, furthermore, did not establish that they were entitled to deduct prepaid rent expenses under the three-pronged test described in Grynberg v. Commissioner, 83 T.C. 255 (1984).

[*31] likewise are not ordinary and necessary business expenses within the meaning of section 162(a). As described above, the trusts did not have rental equipment, office space, or employees. Therefore, any payments to the trusts for repairs and maintenance and pension and profit sharing plans lack not only a business purpose but also substance and, consequently, must be disallowed.[36] With respect to the corporations' deductions for trust payments reported as other expenses, petitioners again claim that these expenses were misclassified and, instead, should have been reported as business development and promotion expenses. However, petitioners did not substantiate their expenses for business development and promotion or provide a business reason that conforms to the requirements of section 162(a). Rather, petitioners rely solely on Dr. Vlach's self-serving testimony that he wanted to make the trusts self-funding so he could pursue alternative medicine full time. The corporations' deductions for all other expenses are therefore disallowed, and respondent's determination is sustained.

---

[36]At trial Dr. Vlach testified that the $1,000 expense for a pension and profit sharing plan was a payment by Consulting Inc. in 2003 for Christmas bonuses to four employees of the Avera clinic. The Court notes that even though the bonus recipients were not Dr. Vlach's employees, the Vlachs' may be entitled to an itemized deduction for business gifts of up to $25 per recipient under secs. 63(d) and 274(b), provided that the Vlachs can meet the substantiation requirements of sec. 274(d).

[*32] The Court notes, however, that its decision to disallow the business expense deductions described above and listed in the notice of deficiency is limited to the payments made by the corporations to the trusts. Indeed, respondent determined that all expenses related to the vitamin and chelation therapy business Dr. Vlach operated through San Dee Cristo are allowable business expense deductions attributed to Dr. Vlach personally.

IV. Unreported Income and Self-Employment Tax

After disallowing deductions for the corporations' payments to San Dee Cristo and Mt. Sophris, respondent determined that the payments were constructive dividends to the Vlachs and must be included in their taxable income for the years at issue. Respondent also determined that the Vlachs must include in income all third-party payments made to San Dee Cristo in exchange for Dr. Vlach's services.

Section 61(a)(7) provides that gross income includes all income from whatever source derived, including, but not limited to, dividends. When a corporation distributes property to a shareholder as a dividend, whether formally or informally, the shareholder must include the distribution in gross income to the extent of the corporation's earnings and profits. See secs. 301(a), (c)(1), 316; see also United States v. Mews, 923 F.2d 67, 68 (7th Cir. 1991). The shareholder

**[*33]** does not need to receive the dividend directly and must include in gross income payments made by the corporation on the shareholder's behalf. See Epstein v. Commissioner, 53 T.C. 459, 474-475 (1969). In determining whether a shareholder received a constructive dividend, the Court considers whether the payment by the corporation benefited the shareholder personally rather than furthering the interest of the corporation. See Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), aff'g in part and remanding on other grounds T.C. Memo. 1987-549.

During 2001 through 2004 the corporations made payments to the trusts of $164,000, $160,000, $61,100,[37] and $32,868, respectively. As discussed above, the Vlachs, as trustees, had exclusive authority to distribute trust proceeds and income at their discretion and, in fact, used their authority to pay for personal investments and expenses with trust funds. Thus, the corporate payments to the trusts solely benefitted the Vlachs personally and, as a result, the Vlachs must include those payments in income as constructive dividends.[38]

---

[37]See supra p. 11.

[38]Petitioners did not address whether the corporations had sufficient earnings and profits for the Court to categorize the payments as dividends under sec. 316. See, e.g., Truesdell v. Commissioner, 89 T.C. 1280, 1295-1296 (1987) (holding that because neither party introduced evidence regarding earnings and profits, taxpayer

(continued...)

**[*34]** Section 61(a)(1) also provides that gross income includes compensation for services. The Court concluded above that San Dee Cristo is a sham entity and should be disregarded. Moreover, the record establishes that San Dee Cristo received third-party payments in exchange for Dr. Vlach's chelation therapy and alternative medicine services. Therefore, the payments are compensation for Dr. Vlach's services under section 61(a)(1) and must be included in the Vlachs' gross income for the years at issue.

Because Dr. Vlach received compensation for services other than those provided to Avera and NWIEP, respondent determined that Dr. Vlach was also liable for self-employment tax and entitled to corresponding self-employment tax deductions. Section 1401 imposes an additional tax on the self-employment income of every individual, both for old age, survivors, and disability insurance and for hospital insurance. Self-employment income is generally defined as "the net earnings from self-employment". Sec. 1402(b). Section 1402(a) defines "net earnings from self-employment" as "the gross income derived by an individual

---

[38](...continued)
failed to meet his burden of proving that there were not sufficient earnings and profits to support the deficiency determined in the notice of deficiency).

[*35] from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".

The Court concluded above that all third-party payments made to San Dee Cristo were attributed to Dr. Vlach's professional services and, consequently, should be included in the Vlachs' income as compensation for services. The payments were therefore earnings from self-employment and were subject to self-employment tax. Accordingly, the Court sustains respondent's determination of self-employment tax and the corresponding self-employment tax deductions.

V. Accuracy-Related Penalties

Respondent determined that petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2) for negligence and substantial understatements of income tax. Negligence includes any failure to make a reasonable attempt to comply with the law, including any failure to maintain adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. In the case of an individual, an understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). In the case of a corporation other than an S corporation, an understatement is substantial (1) for taxable years that began before October 22, 2004, if it exceeds the greater of (a)

[*36] 10% of the tax required to be shown on the return or (b) $10,000, sec. 6662(d)(1)(B); and (2) for taxable years beginning on or after October 22, 2004, if it exceeds the lesser of (a) 10% of the tax required to be shown on the return (or, if greater, $10,000) or (b) $10 million, sec. 6662(d)(1)(B).

The understatements of the Vlachs and Vlach P.C. meet their respective definitions of a substantial understatement of income tax for the years at issue, but those of Consulting Inc. do not meet the test either before or after the October 22, 2004, amendment to section 6662(d)(1)(B). As discussed above, however, Consulting Inc. failed to make a reasonable attempt to comply with the law by claiming false deductions for taxable income it diverted to sham trusts. Consulting Inc. was therefore negligent for purposes of section 6662.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties imposed against any individual. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see also NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006) (holding that by its terms section 7491(c) does not apply to corporate taxpayers). With respect to the Vlachs, respondent has met this burden by establishing that they substantially understated their income tax.

Taxpayers may, however, avoid the accuracy-related penalty under section 6662(a) by establishing that they acted with reasonable cause and in good faith.

[*37] Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448. The decision as to whether taxpayers acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Although Dr. Vlach purchased the trust packages from Dahlstrom, an abusive trust promoter, Dr. Vlach reasonably believed that he was purchasing and subsequently creating business trusts that would protect his personal and business assets from potential lawsuits while he pursued alternative medicine. In fact, the necessity of creating an entity that would protect his assets was even more urgent in 2003, when Dr. Vlach changed insurance carriers to one that would disallow any coverage if he continued his chelation therapy services. While Dr. Vlach's intent for creating the trusts was reasonable, his implementation of the trusts was primarily unreasonable for the reasons discussed above. Accordingly, the Vlachs generally did not act with reasonable cause and good faith.

An exception exists, however, for San Dee Cristo. Dr. Vlach created San Dee Cristo to operate his alternative medicine practice. To advance this purpose Dr. Vlach transferred his ATHA membership and an inventory of medical and health supplements to San Dee Cristo. Dr. Vlach invested San Dee Cristo funds in both a medical syringe company and an offshore medical clinic. When Dr. Vlach

[*38] provided chelation therapy and alternative medicine services, San Dee Cristo received payment from Dr. Vlach's patients and deducted any corresponding expenses. Therefore, Dr. Vlach intended to treat San Dee Cristo as a business trust and kept extensive books and records on his alternative medicine activities. Nonetheless, Dr. Vlach failed to provide San Dee Cristo economic substance apart from tax avoidance when, among other things, he deducted San Dee Cristo's net income as nontaxable distributions to Ixlandia. The Court therefore finds that with respect to San Dee Cristo's alternative medicine income and expenses only, the Vlachs acted with reasonable cause and good faith. Accordingly, the Vlachs are not liable for any accuracy-related penalties for the years at issue with respect to underpayments relating to San Dee Cristo's alternative medicine income and expenses that should have been reported on their individual income tax returns and is subject to self-employment tax. All other accuracy-related penalties are sustained.

The Court has considered the parties' arguments and, to the extent not addressed herein, concludes that they are moot, irrelevant, or without merit.

**[\*39]**  To reflect the foregoing,

Decisions will be entered

under Rule 155.